IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs January 7, 2016

## IN RE: PHILLIP I.P., JR., ET AL.

**Appeal from the Juvenile Court for Washington County**
**No. 43965, 43966     Sharon M. Green, Judge**

_____

**No. E2015-01058-COA-R3-PT-FILED-FEBRUARY 19, 2016**

_____

This appeal concerns the termination of a mother's parental rights. The Tennessee Department of Children's Services ("DCS") filed a petition seeking to terminate the parental rights of Michelle P. ("Mother") to her children Phillip[1] and Emily ("the Children").[2] After a trial, the Juvenile Court found that clear and convincing evidence established the grounds of substantial noncompliance with the permanency plan and persistent conditions, and that termination of Mother's parental rights was in the Children's best interest. Mother appeals to this Court. We affirm the judgment of the Juvenile Court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed;**
**Case Remanded**

D. MICHAEL SWINEY, C.J., delivered the opinion of the court, in which JOHN W. MCCLARTY and THOMAS R. FRIERSON, II, JJ., joined.

David L. Robbins, Johnson City, Tennessee, for the appellant, Michelle P.

Herbert H. Slatery, III, Attorney General and Reporter, and, Kathryn A. Baker, Assistant Attorney General, for the appellee, the Tennessee Department of Children's Services.

_____

[1] Phillip's name also is spelled "Philip" at times. Since we seek to conceal identities in parental termination cases, the discrepancy is not an issue.
[2] DCS's petition also named two other children. Mother surrendered her parental rights to these two children, and this appeal concerns only Phillip and Emily.

# OPINION

## Background

DCS has been involved with Mother's family since November 2006, when the Children were placed in state custody for lack of supervision. Mother eventually regained custody. In February 2008, the Children again were placed in state custody, this time related to alleged violence against certain of the children committed by Mother's then boyfriend. The Children were found dependent and neglected. The Children were placed in the custody of the maternal grandmother. For around five years, the Children remained in the grandmother's custody. Contrary to court order, Mother exercised unsupervised visitation with the Children during this period.

Following serious problems concerning the Children's cleanliness and hygiene, the Children were returned to the custody of DCS in 2013. Following this episode, multiple permanency plans were entered for Mother. These plans had similar responsibilities, including: resolve legal issues; have reliable transportation; cooperate with all providers and follow recommendations; maintain a safe home for the Children; participate in a parenting assessment; and, furnish proof of income. Mother fulfilled certain of her responsibilities. Her home was appropriate, and she was current on child support. Mother also had earned a paralegal certificate, although she incurred $60,000 in debt to do so, and actually earned more money working now at a factory than she earned with the two law firms for which she previously had worked. However, Mother resisted mental health treatment, arguing that she did not need it and could not afford it. In April 2014, DCS filed its petition to terminate Mother's parental rights to the Children. This case was tried in January and March of 2015.

Numerous witnesses testified to their efforts to assist Mother. Audrey Blecha ("Blecha"), a DCS case manager, testified that visitation was difficult. Mother had trouble establishing boundaries, engaging in age-appropriate activities, and administering appropriate discipline. Blecha testified:

> I had significant concerns. We had providers in there helping with therapeutic supervised visitation. It was apparent that mom did not have the ability to manage all four children together. She had difficulty establishing boundaries. She had difficulty engaging in age-appropriate activities. Did not have appropriate discipline and often appeared detached and removed, I guess, from the children. She often reacted by yelling at the children and screaming and threatening to spank as opposed to finding more suitable means of redirection.

Blecha testified to an incident at a DCS office where Emily's behavior deteriorated, and Mother spanked her and threatened to bite her. Blecha stated:

> She appeared to lack any sort of insight as to what was occurring with Emily. And her reactions were more out of anger and frustration. And, like I said, she grabbed her up and spanked her before anyone could stop her. Then she threatened to bite her. Then she continued to make verbal threats until we were finally, just got everyone out of there so we could try to deal with just Emily. She was not able to handle the situation at all.

> Caitlin Goodall ("Goodall"), a foster care counselor at Youth Villages, testified as an expert in trauma counseling for children. Goodall stated that Phillip had severe anger issues and was in a residential treatment facility at only ten years old, an unusually young age for such treatment. Phillip had head-butted Goodall, giving her a concussion, and destroyed the inside of a vehicle. Goodall recounted an incident where Phillip apparently urinated on Emily during a visit at Chick-fil-A in November 2014. According to Goodall, Mother simply said "So what? Kids pee . . . Maybe he had a full bladder." Goodall testified:

> She looked up at me when I had Phillip sit next to me. My co-worker had taken Emily to get a change of clothes. And she was upset that Phillip was having to sit out and asked me why I was having Phillip sit next to me and not play. And I told her that he had urinated on his sister. She said, "So what? Kids pee. That happens. Maybe he had a full bladder and he laughed." I said, "He had been saying he was going to pee on his sister all night." I had to take him aside several times and tell him that, you know, we don't joke about peeing on other people, that is not okay. Then he peed on her and she continued to yell and me. I said, "If you want to talk about that in private, that's fine, but Phillip is becoming uncomfortable and I don't think this is an appropriate conversation to have. We can step outside." She just went back to texting on her phone.

> Lori Styles ("Styles"), a foster care counselor at Youth Villages, testified as an expert in the area of clinical health assessment for children and in clinical mental health for adults. Emily had been sexually abused by Phillip. Without a very structured environment, Emily could become sexually aggressive.

> For her part, Mother testified that she had addressed her anger problems. Mother testified that she was attending anger management and counseling. According to Mother:

Q. Do you believe that over the last two years that your mental and emotional status has improved to where you could parent these children?
A. Yes.
Q. Was that true two years ago?
A. Two years ago, no. Two years ago I would rather smack you than look at you.
Q. Okay. And what's caused the change in you?
A. Partially the anger management helped tremendously. I think most of it was, you know, just basically just growing up and wanting to take the responsibility that I've had all along because they were with me but, you know, to actually exceed that level to please The Department and satisfy them to get the children home.

Mother consistently reiterated the importance of her job as a reason for why she had not been fully compliant with all of her parenting responsibilities. Mother testified:

Q. Do you appreciate the level of appointments that these children have each week? Do you appreciate, you heard the testimony of what a level three foster home is? Do you think you can slam all of the counseling appointments and all of the medical management appointments and all of, everything these children have into one day of the week and have that work? Is that what you envision this being if they come home?
A. No, I don't envision that to be...
Q. Well, how...
A. But I don't envision me losing my job in trying to get these children home either, Sir.

Mother also testified to her account of the incident where Phillip urinated on Emily:

Actually Phillip didn't urinate on Emily. What had happened was Phillip has a, at some of the visits when he gets excited, I don't know if he forgets to go to the bathroom or if he just loses control of his bladder, he will pee on himself. At that particular visit his pants were hard to button and hard to unbutton. He told me, he said, "Mamma, I've got to go to the bathroom." So one of the providers had taken him to the bathroom. When he got back, he tried to hide it because he was going to get in trouble but he had already peed on himself and could not button his pants. And when I had actually come to the knowledge of him being peed on, you know, he's

-4-

like, "Mamma, my pants are unbuttoned." I buttoned his pants back and I asked him because he was wet. He thought he was going to get into trouble. I said, "Phillip, did you pee on yourself?" He didn't want to tell me. He was like, you know, he just kind of looked and kind of shied away. I was like, "You're not going to get into trouble." He's like, "Yeah, Mamma, I peed on myself and I accidently got Emily wet because Emily and I were sliding down the slide together."

In May 2015, the Juvenile Court entered its lengthy and detailed order terminating Mother's parental rights to the Children on the grounds of substantial noncompliance with the permanency plan and persistent conditions.[3] The Juvenile Court held that DCS had not met its burden on the alleged ground of failure to provide a suitable home. We quote the detailed factual findings from the Juvenile Court's final order:

Mother was particularly unhappy about the mental health requirements of the December 10, 2013, permanency plan. She told Ms. Blecha that she did not need it and that she could not afford it. The Department of Children's Services obtained counseling services through Health Connect for Mother, which cost less than that of Frontier Health. There have been on-going therapeutic visitation services since the beginning of the case in March, 2013. Mother has been extremely inappropriate with some of the workers. She "already knew" everything and was only doing it for the court. After the December, 2013, Child and Family Team meeting, Mother said she had purchased a new home although she did not want the DCS family service worker to come to the home. The Family Service worker emphasized to Mother the importance of her going to the home.

The children's visits with Mother were very chaotic. Mother was often verbally aggressive and erratic toward professionals in front of the children. Mother's moods switched quickly during the visits. She yelled and screamed in the presence of the children and there was an ongoing battle with DCS about being appropriate. She frequently said, in front of the children, that she was struggling to pay rent and the electricity and have something to eat. She said that if she sold plasma, she could eat. During the entire time Ms. Blecha was the family service worker, the children had negative behaviors during the visits and had significant acting out during

_____

[3] DCS was awarded partial guardianship of the Children, subject to termination of the father's parental rights.

-5-

the visits. According to Ms. Blecha, the children were not a priority in Mother's life. The children had to "mold" around Mother's needs.

The Court entered an Order on February 11, 2014, rescheduling Mother's visitation with the children from Wednesdays between 4:30 and 6:30 p.m. until Thursdays from 5:30 until 7:30 p.m. due to Mother's work schedule. At a review hearing on March 12, 2014, the Court directed the Department of Children's Services to conduct a home visit of Mother's home upon her providing an address to the Department. DCS provided intensive individual parenting education to Mother in her home through Youth Villages in December, 2013. Jackie McCartt became the DCS family service worker for the children in June, 2014, and has continued in that capacity as of the trial on the Petition. During the visits which were supervised by Ms. McCartt, Mother was more interested in what was going on with her cell phone than interacting with all the children. Mother had to be prompted to do something other than letting the children run around the room. Mother did not attend Foster Care Review Board meetings for the children since Ms. McCartt has been the assigned family service worker and Mother failed to attend appointments for the children. Mother has never progressed to unsupervised visitation. There have been no visits in Mother's home because she has not always been appropriate. Mother encourages negative behaviors of the children.

At a review hearing on September 17, 2014, the Court approved the fourth permanency plan. The fourth permanency plan had the dual goals of "return to parent" and "adoption" and contained substantially the same responsibilities for Mother as had been set out in the prior plans, with the added requirements that Mother would attend all medical, educational, and family therapy appointments, she would provide proof of a stable home to DCS, she would keep the Department of Children's Services informed of any address or telephone change within 24 hours, that she would interact appropriately with all providers, the Department, court staff, community partners, and other professionals, and that she would sign releases to DCS for all her providers to verify her participation. The Court reviewed the grounds for termination of parental rights with Mother when the permanency plan was approved on September 17, 2014. Mother had signed a copy of the Criteria and Procedure for Termination of Parental Rights, which was attached to the permanency plan, on September 17, 2014.

Eva [D.] was a former foster parent for Philip through Youth Villages. She has been a foster parent for approximately 6 years and has

had twenty to twenty-five children in her home over the years. Philip came to her home in November, 2014, for approximately one month. Philip was frequently angry for no apparent reason, "fussed" at another foster child a lot, and kicked holes in the wall at the church. He required constant supervision to make sure he was safe. His mother called Philip once every two weeks. He told Ms. [D.] several times a day that he loved her and he even called her Momma. Ms. [D.] transported Philip to visits with his mother, 75 miles each way. Although Philip appeared to look forward to the visits, his behavior varied on the way home. On one occasion, she transported Emily and Philip together and he smacked Emily badly. Philip was admitted to Peninsula Hospital from Ms. [D.]'s home. He is currently in a Level 3 residential placement at Bartlett. He is on a "very, very, very structured living plan" according to Ms. McCartt. He receives daily therapy and is still having trouble. In the DCS family service worker's opinion, to change his current placement would be detrimental to him. The Department of Children's Services has provided assistance for Mother to visit with Philip in Memphis by furnishing her a gasoline card. Youth Villages paid the expenses for Mother's motel while she was there for a visit. Mother took her paramour with her on the trip. Philip and Emily both have very serious mental health issues. Mother's participation and involvement in the children's treatment has been minimal. Mother has not attended any of Emily's mental health sessions and does not participate in her treatment. She has not attended any of Philip's mental health sessions. She has never participated in family therapy with the children.

Mother testified that she was having extensive unsupervised contact with the children prior to the filing of the Petition to Adjudicate Dependency and Neglect and For Temporary Custody on March 14, 2013, and acknowledged that she knew it was in violation of the prior order from the Juvenile Court of Carter County. Mother's testimony that she had responsibility for the children ninety (90%) percent of the time prior to the filing of the Petition to Adjudicate Dependency and Neglect and For Temporary Custody was not credible. She acknowledged that she had never testified to this at any time prior to the hearing in this cause. Her testimony is inconsistent with her own testimony that when Philip ran away and came to her house, she "freaked out." Mother never filed any pleading with the Juvenile Court of Carter County for return of the custody of Philip or Emily to her or for modification of the order prohibiting her from having unsupervised contact with the children. While Mother was having unsupervised visitation with the children, she transported the children in her vehicle even though she did not have a driver's license. She justified this

illegal act in her testimony that she did not have a choice but to drive without a driver's license.

On March 10, 2015, Mother testified that she had recently "started" individual therapy with "Hillary" with First Baptist Counseling and that she had had two (2) therapy appointments. She was not able to furnish the last name of "Hillary" when questioned and "Hillary" was not a witness in these proceedings. Mother testified that she had recently participated in anger management counseling with "Christa", again whose last name she did not know, and that they "went over triggers of anger" which she testified were the Department of Children's Services and providers. She testified that she did not begin either counseling until after the Department of Children's Services had filed its petition to terminate her parental rights. "Christa" was not a witness in these proceedings. There was no proof that Mother had completed either counseling. Mother testified that she believed she was doing very well "considering the circumstances." She testified that two years ago, she would "rather smack you as look at you," and that the anger management counseling has helped. Mother acknowledged that she was aware that the grandparents were withholding food from the children as punishment. Mother acknowledged that she was aware that another one of the female children was sleeping with the grandfather. Mother's testimony that she had called the DCS "hotline" numerous times to report the abuse the children were suffering in the home of the grandparents was not credible.

The testimony of [Mother] focused on recent changes she has made in her life. She presented to the Court a copy of a purchase agreement which she described as "lease to own" at the rate of $775.00 each month for property located in Kingsport, Tennessee, and having 5 bedrooms. The unsigned, typed "purchase agreement" which Mother filed as an exhibit to her testimony concerning her current home indicated the buyers as "[Mother] and/or James [J.]." The Affidavit of Reasonable Efforts dated December 10, 2013, by Audrey Blecha which was filed as a part of the record in this cause stated, "[Mother] has recently requested that her paramour, James [J.], be allowed to have visitation with her children. Mr. [J.] has criminal history, including a charge of statutory rape in 2000." Mother testified that she has a stable income and that if she received custody of the children, she would apply for food stamps and would sue the children's father for child support. Mother has student loans in the amount of $60,000.00 for her work toward an on-line paralegal certificate although she initially testified that she did not have to pay anything for obtaining this

certificate. Since obtaining the certificate, she worked for two law firms for short lengths of time, one of which laid her off and the other from which she was let go. She is presently working a temporary job through the Elwood Staffing Agency at . . . [a] factory, earning $9.50 per hour plus a factory commission bonus each week, although there was no proof other than her testimony about her employment. Mother acknowledged that she owes the maternal grandmother $11,000 for child support arrears. Mother acknowledged that she had recently gone to the beach with her boyfriend, Kenny [H.], and his daughter for the weekend and that one of the purposes of the trip was for her "to bond with his daughter." She testified that he should not be "relevant" to the Department of Children's Services although her prior boyfriend was a sexual offender.

Mother testified that her relationship with the children was "not as nurturing as I would like it to be" but attributed her lack of nurturing to the limited visitation she has had with the children. She attributed her limited visitation to the Department of Children's Services scheduling visits and appointments with the children on days which were not convenient with her schedule. She testified that she did not "envision losing [her] job to attend appointments." Mother acknowledged that she missed visits with her children because she put work first and her school second. She testified that she did not have regular visitation with the children until the Court entered an order scheduling her visits and that since then, she had missed approximately four (4) visits. Mother testified that she does not think it is in the best interests of the children to be in her home at this time. Philip is currently in treatment at a Level 3 placement, and she believed that he should complete his treatment.

Mother acknowledged that she needed family therapy with Philip and Emily and that she needed proper training so that she could control Philip. She acknowledged that she has known that Philip has had "behaviors" since 2008, when custody was removed from her. Mother acknowledged her understanding that Philip and Emily may not be alone together but that it will be "substantially easier when the children are under one roof." Her explanation about keeping the children supervised at all times is not credible considering the testimony of the mental health professionals who have been working with the children. Mother considered the requirements of the Department of Children's Services as "hoops" she must complete. The strongest emotion Mother expressed during her testimony was that she cares for the future and well-being of the children. Nowhere in her testimony did she testify that she loved the children.

(Format modified). We next quote from the Juvenile Court's thorough final order as it pertains to grounds for termination:

[Substantial Noncompliance with Permanency Plan]

The Court finds that Mother's participation in a clinical parenting assessment and following all recommendations including mental health treatment/counseling; participation in parenting education and being able to consistently demonstrate age appropriate parenting skills for all the children; attending all appointments, school meetings, counseling appointments, medical, educational, and family therapy appointments of the children; and cooperating with all providers, are reasonable and are related to remedying the conditions which necessitated foster care for the children.

Mother did participate in a clinical parenting assessment with Foundation for Life Principles in October, 2013, so she completed the initial part of this requirement. The remainder of the requirement to follow all recommendations of the parenting assessment was the critical part of this requirement. The report of the clinical parenting assessment which was filed as a part of the record in this cause contained several recommendations for Mother, including: individual counseling, treatment regime for treating Mother's bipolar diagnosis, family counseling, following through with recommendations from previous psychological evaluation, anger management class and group, hands-on parenting education, attain primary care physician and maintain physical health, successful completion of teen parenting classes, acquire a driver's license and reliable transportation, provide snacks and age appropriate activities for visitation, and skills to address good decision making and budgeting. The DCS family service worker provided Mother with a one-page synopsis of her requirements under the clinical parenting assessment report.

The prior psychological evaluation of Frontier Health which was referenced in the clinical parenting assessment had been completed on February 28, 2012, and was filed as a part of the record in this cause. The recommendations from that evaluation included individual therapy to address anxiety, anger management skills and appropriate interpersonal functioning skills; intensive family therapy services to focus on provision of consistent and safe home environment, family communication, family rules and consequences and age appropriate parenting techniques; parenting education to focus on parental skill development and age appropriate

-10-

parenting techniques; and intensive in-home services to monitor her behaviors and home environment, ensure compliance with recommendations and reinforce therapeutic interventions. The Department of Children's Services family service worker provided Mother with the recommendations from the prior psychological evaluation on the one-page synopsis with the parenting assessment recommendations.

Mother did not even begin individual counseling until after the Petition to terminate her parental rights was filed. At the time of trial, she had attended only two (2) therapy appointments with "Hillary" at First Baptist Counseling. The Department of Children's Services had made a referral for an in-home therapist for individual counseling through Heath Connect at a less expensive rate than Mother said Frontier Health would charge her due to her not having insurance, but Mother did not take advantage of those services.

Mother never attended family therapy with Philip or Emily. She had only attended two out of five family therapy sessions with Hannah, an older sibling of these children, for whom she executed a surrender of her parental rights during the pendency of these proceedings.

Mother never attended an anger management class or group hands-on parenting education. Mother testified that she attended anger management counseling with "Christa" although she did not sign a release so that DCS could verify it. There was no evidence in the record, other than her testimony, that she had attended anger management counseling. She did not even testify that she had completed anger management counseling, only that she had "attended." Due to the court's findings on Mother's testimony not being credible on other issues, issues, the court is not inclined to accept her testimony on this issue.

The Department of Children's Services provided parenting education to Mother during supervised therapeutic visitation, although Mother was never able to progress to unsupervised visitation over the two year period the children have been in DCS custody. Mother continued to make inappropriate comments to the children, did not employ appropriate discipline, was often detached and removed from the visits, yelled and screamed inappropriately at the children, and made many verbal threats to the children. Mother encouraged negative behaviors of the children. She was verbally aggressive and erratic toward professionals in front of the children.

Mother did not follow through with the recommendations from the psychological evaluation, many of which were already incorporated into the permanency plan. Although the psychological evaluation did not reference a bipolar diagnosis for Mother, it did provide a diagnosis of personality disorder not other specified and contained specific issues for Mother's individual therapy to address, such as anxiety, anger management skills and appropriate interpersonal functioning skills; specific issues for family therapy services to focus on such as consistent and safe home environment, family communication, family rules and consequences and age appropriate parenting techniques; and specific issues for parenting education to focus on such as parental skill development and age appropriate parenting techniques. Mother has not completed any of these requirements.

Mother never participated in the medical, dental, vision, or mental health therapy appointments of Philip or Emily. She has only attended one IEP meeting for one of the children. She only attended 5 out of 18 Child and Family Team meetings involving the children. She did not attend the Foster Care Review Board meetings for the children.

The children have very serious mental health needs and Mother's participation in the children's therapy is critical. Mother's behavior reflects her opinion that the requirements of the Department of Children's Services are "hoops" she must complete. She has not made any significant change in her circumstances which would demonstrate that the children would be safe in her home. She is quick to point out how she has bettered herself with a paralegal degree which she does not use, and with her employment through a temporary agency with a compressor factory for 6 days each week. She has obtained a home which is "rent to own." Mother may have worked hard to improve her income and her home, but the reasons which brought about the custody of the children in the Department of Children's Services had nothing to do with her income or the physical condition of her home. From the record from the Juvenile Court of Carter [sic] Carter County, the issues which led to the 2008 removal of the children from her home were physical abuse of Philip and her lack of parenting skills. Philip is now in a Level III residential treatment facility and Mother has not participated at all in his treatment. She has made one visit to see him, at the expense of the Department of Children's Services and Youth Villages. Mother acknowledged that she knew that Philip had "behaviors" in 2008 when his custody was removed from her although the Affidavit of Reasonable Efforts filed by the Department of Children's Services in the original

proceedings documented that Mother "refused" services in February, 2008, by the Department of Children's Services.

The unsigned "purchase agreement" which Mother filed as an exhibit to her testimony indicated the buyers as "[Mother] and/or James [J.]." The Affidavit of Reasonable Efforts dated December 10, 2013, by Audrey Blecha which was filed as a part of the record in this cause stated, "[Mother] has recently requested that her paramour, James [J.], be allowed to have visitation with her children. Mr. [J.] has criminal history, including a charge of statutory rape in 2000." There was no evidence to the contrary in the record.

The Department of Children's Services has proven, by clear and convincing evidence, that Mother has not substantially complied with her responsibilities in the permanency plans filed in the underlying dependency and neglect proceedings by clear and convincing evidence and that the statutory ground of termination of Mother's parental rights under Tenn. Code Ann. §36-1-113(g)(2) has been proven by clear and convincing evidence.

[Persistent Conditions]

In this case, the children were removed from Mother's custody by order of the Juvenile Court of Carter County, upon the entry of a Protective Custody Order on February 20, 2008. The children were adjudicated dependent and neglected in Mother's custody on April 17, 2008.. The children have never been returned to the custody of Mother since their removal in 2008. The order removing the child from the custody of Mother was entered more than seven (7) years prior to the final day of testimony on the Petition filed by the Department of Children's Services to terminate Mother's parental rights.

By order from the Juvenile Court of Carter County, the children were placed in the custody of their maternal grandmother on July 23, 2008. They were subsequently removed from the custody of their maternal grandmother by order of the Juvenile Court of Johnson City upon the entry of a Protective Custody Order on March 14, 2013. A finding of dependency and neglect by clear and convincing evidence was made as to Mother in the 2013 proceedings on the basis that "[h]eretofore, the Carter County Juvenile Court made a finding of dependency and neglect as to Ms. [Mother]. As of the filing of the State's petition and summary removal of

-13-

the children from the custody of [maternal grandmother], [Mother] had not addressed the issues that led to the removal of the minor children from her home."

On August 14, 2012, in separate proceedings involving another child of Mother's who is not a subject of these proceedings, the Court found that a barrier to reunification with Mother was her lack of parenting skills, her failure to attend individual counseling, the child's behaviors after visits, and Mother's lack of appropriate transportation.

Mother struggled with boundaries for the children during her supervised visits, which were often chaotic, and she had trouble engaging with the children appropriately. Mother did not employ appropriate discipline for the children, she was often detached and removed from the visits, she yelled and screamed inappropriately at the children, she made verbal threats to the children, and she made inappropriate comments in front of the children. Mother was often verbally aggressive and erratic toward professionals in front of the children. Mother was more interested in what was going on with her cell phone than interacting with all the children during the visits. Mother had to be prompted to do something other than letting the children run around the room. She used profanity around the children during the supervised visits. Her moods switched quickly and her behaviors escalated during visits. The children had negative behaviors during the visits which Mother was not able to address appropriately. In the clinical parenting assessment, she was observed to lack an understanding of basic parenting tasks.

Mother acknowledged that she was not as nurturing a parent as she would like to be. She failed to show consistent affection or boundaries with Emily during the supervised visits, which the child needed. Mother acknowledged that it was not in the best interests of the children to be returned to her custody at this time. Mother acknowledged that she needed family therapy with Philip and Emily before the children were to return to her custody.

Mother does not appear to understand the need for constant supervision of the children due to Emily being the victim of Philip sexually offending against her. Mother appeared nonchalant when the children were playing in the "tubes" during a visit, resulting in Philip urinating on Emily. Mother denied that Philip had urinated on Emily, postulating that maybe Philip had a full bladder. Mother's theory that it will be easier to monitor

the children when they are under one roof is not supported by the proof, is simplistic, and unbelievable. To reexpose Philip and Emily to each other would reinforce their behavior in the testimony of an expert witness. Mother has chosen to ignore safety concerns for the children during other visits, such as scheduling a visit during a pumpkin carving event even though the children cannot have knives due to their aggression.

The credible testimony of Lori Styles was that visits with Mother trigger Emily's aggressive behaviors. Mother does not try to control Emily or address the issues which arise during the visits. If the very strict and controlled environment was removed from Emily, she would probably show sexually aggressive behaviors, physically aggressive behaviors, and emotionally aggressive behaviors.

Structure is also very important to Philip as well and if he was placed in an unstructured setting, it would result in his hospitalization. It would be detrimental if he was left alone with another child.

Mother has failed to address her own mental health needs, which have been documented since the 2008 removal of the children from her custody. Mother's specific mental health needs were identified for her in the 2012 psychological evaluation. She failed to begin individual counseling until after the Petition for the termination of her parental rights was filed by the Department of Children's Services and as of the last day of trial had only attended two appointments.

Although Mother received therapeutic parenting education during her supervised visitation with the children, she never progressed to the point to having unsupervised visitation.

Mother failed to demonstrate that she could meet the intensive needs of the children. She failed to attend more than two-thirds of all Child and Family Team meetings for the children. She failed to attend Foster Care Review Board meetings for the children. She did not participate in medical, dental, vision, or mental health appointments for the children. She failed to attend family therapy with the children. She acknowledged that she made her work and school as priorities over her children.

Mother has shown little regard for obeying the law. She acknowledged that she was in willful disobedience of the order from the Juvenile Court of Carter County which prohibited her from having

unsupervised visitation with the children. She acknowledged that she willfully drove a vehicle without a valid driver's license with the children in the car with her.

The Court is, therefore, of the opinion and so holds that Mother's lack of appropriate parenting skills, her own unaddressed mental health needs, her inability to demonstrate that she can meet the children's mental health and safety needs, and her inability to demonstrate that she can comply with an order of a court for the purpose of protecting the children are conditions which would in all reasonable probability cause the children to be subjected to further abuse or neglect. Since the children have been removed from Mother's custody over seven (7) years without her remedying any of these conditions, the likelihood of the conditions being remedied at an early date so that the children could be safely returned to her custody in the near future is not likely. Continuation of the parent and child relationship greatly diminishes the children's chances of early integration into a safe and stable and permanent home.

The Court finds that the Department of Children's Services has, therefore, proven the statutory ground of persistent conditions by clear and convincing evidence in that the conditions which led to the children's removal in 2008 or other conditions that in all reasonable probability would cause the children to be subjected to further abuse or neglect and that prevent the children's safe return to the care of the parent still persist; that there is little likelihood that these conditions will be remedied at an early date so that the children can be safely returned to Mother in the near future; and the continuation of the parent and child relationship greatly diminishes the children's chances of early integration into a safe, stable, and permanent home by clear and convincing evidence.

Finally, the Juvenile Court found that termination of Mother's parental rights was in the Children's best interest, stating in part:

Mother has failed to participate in individual counseling which would have assisted her in addressing her own mental health needs which interfere with her ability to parent the children effectively. The psychological evaluation identified multiple areas that Mother should have addressed in counseling including anxiety, anger management, appropriate interpersonal functioning skills, consistent and safe home environment, family communication, family rules and consequences, and age appropriate parenting techniques. The overwhelming evidence was that the children's

-16-

visits with Mother were chaotic, that she encouraged negative behaviors of the children, and that she failed to demonstrate appropriate parenting, In spite of two years of therapeutic supervised visitation, Mother never progressed to unsupervised visitation.

Mother has failed to acknowledge the danger that Philip is to his younger sister, Emily, who he had sexually abused. Mother has refused to acknowledge that Philip urinated on his younger sister while they were playing in "tubes" a few feet away from her during a visit.

***

A change of caregivers would have a detrimental effect on the children. Mother, herself, testified that she was not ready for the children to come home and that she did not believe it was in the children's best interests to be in her home at this time. Philip is in a very structured living plan at a Level 3 residential placement at Bartlett in Memphis. He receives therapy daily and is still having trouble. To change his current placement would be detrimental to him. Emily needs a very strict and controlled environment. If structure is removed from her, she would probably show sexually aggressive behaviors, physically aggressive behaviors, and emotionally aggressive behaviors.

Mother appeals the termination of her parental rights to the Children to this Court.

## Discussion

We restate the issues raised by Mother on appeal as follows: 1) whether the Juvenile Court erred in finding that the ground of substantial noncompliance with the permanency plan was proven by clear and convincing evidence; 2) whether the Juvenile Court erred in finding that the ground of persistent conditions was established by clear and convincing evidence; and, 3) whether the Juvenile Court erred in finding that clear and convincing evidence established that termination of Mother's parental rights is in the Children's best interest.

Our Supreme Court reiterated the standard of review for cases involving termination of parental rights stating:

This Court must review findings of fact made by the trial court *de novo* upon the record "accompanied by a presumption of the correctness of

-17-

the finding, unless the preponderance of the evidence is otherwise." Tenn. R. App. P. 13(d). To terminate parental rights, a trial court must determine by clear and convincing evidence not only the existence of at least one of the statutory grounds for termination but also that termination is in the child's best interest. *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002) (citing Tenn. Code Ann. § 36-1-113(c)). Upon reviewing a termination of parental rights, this Court's duty, then, is to determine whether the trial court's findings, made under a clear and convincing standard, are supported by a preponderance of the evidence.

*In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006).

In *Department of Children's Services v. D.G.S.L.*, this Court discussed the relevant burden of proof in cases involving termination of parental rights stating:

It is well established that "parents have a fundamental right to the care, custody, and control of their children." *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988) (citing *Stanley v. Illinois*, 405 U.S. 645, 92 S. Ct. 1208, 31 L. Ed. 2d 551 (1972)). "However, this right is not absolute and parental rights may be terminated if there is clear and convincing evidence justifying such termination under the applicable statute." *Id.* (citing *Santosky v. Kramer*, 455 U.S. 745, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982)).

Termination of parental or guardianship rights must be based upon a finding by the court that: (1) the grounds for termination of parental or guardianship rights have been established by clear and convincing evidence; and (2) termination of the parent's or guardian's rights is in the best interests of the child. Tenn. Code Ann. § 36-1-113(c). Before a parent's rights can be terminated, it must be shown that the parent is unfit or substantial harm to the child will result if parental rights are not terminated. *In re Swanson*, 2 S.W.3d 180, 188 (Tenn. 1999); *In re M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). Similarly, before the court may inquire as to whether termination of parental rights is in the best interests of the child, the court must first determine that the grounds for termination have been established by clear and convincing evidence. Tenn. Code Ann. § 36-1-113(c).

*Dep't of Children's Servs. v. D.G.S.L.*, No. E2001-00742-COA-R3-JV, 2001 WL 1660838, at *6 (Tenn. Ct. App. Dec. 28, 2001), *no appl. perm. appeal filed*. Clear and

convincing evidence supporting any single ground will justify a termination order. *E.g., In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002).

Two grounds for termination of Mother's parental rights were found by the Juvenile Court and are at issue on appeal. Tenn. Code Ann. § 36-1-113 (g)(2) (2014) provides the first relevant ground of substantial noncompliance with the permanency plan as follows: "There has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan pursuant to the provisions of title 37, chapter 2, part 4." Regarding persistent conditions, the termination statute states:

> (3) The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:
>
> (A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent or parents or the guardian or guardians, still persist;
>
> (B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or parents or the guardian or guardians in the near future; and
>
> (C) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home;

Tenn. Code Ann. § 36-1-113(g)(3) (Supp. 2015).[4]

We first address whether the Juvenile Court erred in finding that the ground of substantial noncompliance with the permanency plan was proven by clear and convincing evidence. The Juvenile Court found the following responsibilities of Mother's permanency plan to be reasonable and related to remedying the reasons the Children entered foster care: complete a mental health assessment and follow recommendations; undertake parenting education; attend all school meetings and appointments; and, cooperate with providers. Mother did complete a DCS-funded clinical parenting assessment and a psychological assessment, but failed to follow recommendations such as obtain mental health treatment. Mother initially maintained that she did not need mental health services and moreover could not afford it. Mother's protestations continued despite DCS's offers to find less expensive providers. As of trial,

---

[4] No relevant, substantive changes were made to this statute since the trial in this matter.

Mother purportedly had begun therapy and attended anger management. The Juvenile Court found Mother's account as to this not credible. With regard to parenting skills, Mother never progressed to unsupervised visitation with the Children. The testimony at trial was that Mother's parenting skills did not improve. Multiple witnesses testified to Mother's anger and lack of cooperation with providers. In short, Mother has displayed a high degree of indifference to the statement of responsibilities in her permanency plans. The evidence does not preponderate against any of the Juvenile Court's findings relevant to this issue. We find, as did the Juvenile Court, that clear and convincing evidence establishes the ground of substantial noncompliance with the permanency plan.

We next address whether the Juvenile Court erred in finding that the ground of persistent conditions was established by clear and convincing evidence. The Children were removed from Mother in 2008, and the petition to terminate parental rights was filed in April 2014. Phillip and Emily had not lived with Mother for seven years. This ground requires us to determine whether, among other things, Mother has remedied her situation such as to correct those conditions that led to removal.

The evidence in the record on appeal is overwhelming that these conditions have not been corrected. The Children suffer from severe behavioral issues, and Mother has shown no ability to effectively contend with these issues. Indeed, Mother never comprehensively completed treatment for her own mental health issues. Mother herself acknowledged that the Children are not ready to reside with her. We agree with Mother to that extent. The evidence does not preponderate against the findings by the Juvenile Court relevant to this issue. We find, as did the Juvenile Court, that the ground of persistent conditions has been established by clear and convincing evidence.

The final issue we address is whether the Juvenile Court erred in finding that clear and convincing evidence established that termination of Mother's parental rights is in the Children's best interest. The following statutory factors are to be considered by courts when determining whether termination of parental rights is in the child's best interest:

(i) In determining whether termination of parental or guardianship rights is in the best interest of the child pursuant to this part, the court shall consider, but is not limited to, the following:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113 (i) (2014).

The Juvenile Court made detailed findings based on several of the statutory factors as to the Children's best interest, and the evidence does not preponderate against these findings by the Juvenile Court. Mother has not reached a point where she can safely parent the Children. Mother's visits with the Children often have been marked by chaos and Mother's detachment. Mother made late efforts to establish stable housing and attend counseling after the petition to terminate parental rights was filed, but these efforts

are of an eleventh hour nature and not very compelling in light of her long record of deprioritizing her parenting responsibilities. Mother prioritized her personal work and educational goals over cooperating with DCS such that she could be reunited with the Children. Work and education are commendable, but they cannot supplant Mother's other obligations with respect to doing what she was required to do to regain custody of the Children. Mother, at best, put these objectives at odds with her parental responsibilities with those responsibilities coming a distant second. Mother used her work and education as unconvincing excuses for her failure to meet her parental responsibilities. Finally, the evidence in the record is that the Children require very structured environments. We have absolutely no basis in the record supporting the proposition that Mother can offer the kind of structured environment these Children so strongly require. Indeed, given the evidence outlined above, the reverse is true.

We find, as did the Juvenile Court, that clear and convincing evidence establishes the grounds of substantial noncompliance with the permanency plan and persistent conditions with respect to Mother. We also find, as did the Juvenile Court, that termination of Mother's parental rights is in the Children's best interest. We affirm the judgment of the Juvenile Court in its entirety.

## Conclusion

The judgment of the Juvenile Court is affirmed, and this cause is remanded to the Juvenile Court for collection of the costs below. The costs on appeal are assessed against the Appellant, Michelle P., and her surety, if any.

_____
D. MICHAEL SWINEY, CHIEF JUDGE

-22-